1    WO

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

9    Rick Lee Albery,                    No. CV-13-00321-PHX-BSB

10                    Plaintiff,          **ORDER**

11   v.

12   Carolyn W. Colvin, Acting Commissioner
     of Social Security,
13
                      Defendant.
14

15         Plaintiff Rick Lee Albery seeks judicial review of the final decision of the

16   Commissioner of Social Security (the Commissioner), denying his application for

17   disability insurance benefits under the Social Security Act (the Act).  The parties have

18   consented to proceed before a United States Magistrate Judge pursuant to 28

19   U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure

20   16.1.[1]  For the following reasons, the Court reverses the Commissioner's decision and

21   remands for an award of benefits.

22   **I.      Procedural Background**

23         In September and October 2009, Plaintiff applied for disability insurance benefits

24   and supplemental security income under Titles II and XVI of the Act based on disability

25   beginning August 2009.  (Tr. 14.)[2]  After the Social Security Administration (SSA),

26   _____

27         [1]  This matter is suitable for resolution based on the briefs.  Accordingly, the Court
     denies Plaintiff's request for oral argument.  *See* LRCiv. 7.2(f).
28
           [2]  Citations to "Tr." are to the certified administrative transcript.  (Doc. 12.)

1  denied Plaintiff's initial application and his request for reconsideration, he requested a

2  hearing before an administrative law judge (ALJ).[3]   After conducting a hearing, the ALJ

3  issued a decision finding Plaintiff not disabled under the Act.  (Tr. 14-29.)  This decision

4  became the final decision of the Commissioner when the Social Security Administration

5  Appeals Council denied Plaintiff's request for review.  (Tr. 1-5); *see* 20 C.F.R. § 404.981

6  (explaining the effect of a disposition by the Appeals Council.)   Plaintiff now seeks

7  judicial review of this decision pursuant to 42 U.S.C. § 405(g).

8  **II.    Medical Record**

9        The record before the Court establishes the following history of diagnosis and

10 treatment related to Plaintiff's physical impairments.  The record also includes an opinion

11 from a state agency physician who reviewed the records related to Plaintiff's

12 impairments, but who did not provide treatment.

13       **A.    Surgical Procedures in 2009**

14       In August 2009, Plaintiff was admitted to the hospital for chest pains.  (Tr. 799.)

15 Testing revealed a left ventricular apical aneurysm with thrombus and ischemic

16 cardiomyopathy, with a forty percent ejection fraction.  (Tr. 798-99.)  Plaintiff also had

17 an eighty percent blockage of the left anterior descending coronary artery.  (Tr. 260.)  On

18 August 23, 2009, Dr. Roger Hucek, M.D., performed coronary artery bypass surgery and

19 left ventricular aneurysm repair on Plaintiff.  (Tr. 262-64.)  An echocardiogram the next

20 month showed normal left ventricular systolic function (with an ejection fraction of sixty

21 percent) and mild enlargement of the left ventricle.  (Tr. 791.)   However, Plaintiff's

22 sternum was cracked during the bypass surgery and he developed an infection at the

23 fracture site, which required hospitalization in September 2009 for a wound debridement

24 procedure that Dr. Hucek performed.  (Tr. 381, 306.)  At the time of that procedure,

25 transesophageal echocardiography revealed an ejection fraction of thirty percent (Tr.

26

27

28       [3]  The initial and reconsideration determinations are made by state agencies acting
     under the authority of the Commissioner.   *See* 20 C.F.R. §§ 404.1503, 416.903,
     416.1013.

- 2 -

306), and a regular echocardiogram showed left ventricular ejection fraction of fifty to fifty-five percent, but with impaired left ventricular function (filling defect).  (Tr. 398.)

### B.    Treatment from 2010 through 2011

In March 2010, Plaintiff began treatment with Robert Bear, D.O., at Cardiovascular Consultants.  Plaintiff presented with palpitations associated with shortness of breath.  (Tr. 515.)  Plaintiff had a decreased pulse in both legs.  (Tr. 516.) Dr. Bear ordered diagnostic tests including an echocardiogram, which showed a forty percent ejection fraction.  (Tr. 513.)  He also ordered a nuclear stress test, which showed a thirty-six percent ejection fraction and an anteroapical myocardial infarction (heart attack) with inferior wall perfusion defect.  (Tr. 514.)  He also ordered ankle-brachial indices, which indicated abnormal blood flow to the left leg.  (Tr. 528.)  Dr. Bear noted Plaintiff's history of coronary artery disease, type II diabetes, and palpitations.  (Tr. 515.) At a follow-up appointment in May 2010, Dr. Bear noted that the diagnostic tests indicated "peripheral arterial disease involving the lower left extremity," which was consistent with Plaintiff's left leg claudication.  (Tr. 551.)

In June 2010, Dr. Bear reported that Plaintiff also suffered from neuropathy in the feet, probably unrelated to the claudication symptoms.  (Tr. 549.)  Plaintiff also had slow blood flow to the lower extremities.  (Tr. 545.)  At the end of June 2010, Plaintiff started using a walker due to leg weakness.  (Tr. 669.)  His pulses were markedly impaired (1+) in the lower extremities, and he had demonstrable weakness in both lower extremities. (Tr. 670.)

A September 2010 stress test showed findings consistent with a prior myocardial infarction and a thirty-nine percent ejection fraction.  (Tr. 644-45.)  When Plaintiff presented to Cardiovascular Consultants later that month, he had swelling in his feet, paroxysmal nocturnal dyspnea (shortness of breath), and occasional palpitations. (Tr. 666.)  Nurse Practitioner Darlene Bidwell noted Plaintiff was using a wheelchair

1   because he became short of breath walking short distances.  (*Id*.)  She also noted that

2   Plaintiff was "NYHA Class III to IV."[4]  (*Id*.)

3       In October 2010, Plaintiff saw Thomas Perry, M.D., at Maryvale Cardiology with

4   complaints of dyspnea, insomnia, and dizziness.  (Tr. 643.)  Dr. Perry noted that Plaitiff

5   used a wheelchair because he was afraid of falling.  (*Id*.)  He ordered a Holter monitor for

6   Plaintiff.  (Tr. 642.)  An echocardiogram that month showed decreased left ventricular

7   function.  (Tr. 641.)  On November 3, 2010, Dr. Perry noted that Plaintiff complained of

8   shortness of breath, chest pains, and dizziness.   (Tr. 639.)   He advised Plaintiff to

9   continue with cardiac rehabilitation and adjusted Plaintiff's medications.  (*Id*.)  In January

10  2011, while he was at a cardiac rehabilitation appointment, Plaintiff was sent to the

11  emergency   room   for   chest   pains   and   shortness   of   breath.      (Tr. 694.)   Cardiac

12  catheterization   showed   diffuse   ninety-five   percent   narrowing   in   the   left   anterior

13  descending artery in the mid-segment.  There was also moderate left ventricular systolic

14  dysfunction.   (Tr. 692.)   A transesophageal echocardiogram showed there was no

15  thrombus of the left atrium and a fifty percent ejection fraction, described as "low

16  normal."  (Tr. 688-89.)

17      Plaintiff returned to Cardiovascular Consultants for further treatment in 2011.

18  (Tr. 654-56.)  During a June 2011 appointment, Dr. Bear noted that Plaintiff's lower

19  extremity   pulses   were   moderately   impaired   (2+),   and   continued   his   medications.

20  (Tr. 651-53.)  A transesophageal echocardiogram in July 2011 was normal, with no sign

21  of thrombus.  (Tr. 683.)  Plaintiff returned to the emergency room in July 2011 because

22  of chest pain, and testing ruled out a heart attack.  (Tr. 679-82.)

23  _____

24      [4]  Plaintiff states that The New York Heart Association Functional Classification
25  III means "[p]atients have cardiac disease resulting in marked limitation of physical
    activity.  They are comfortable at rest.  Less than ordinary physical activity causes fatigue,
26  palpitation, dyspnea, or angina pain."  (Doc. 22 at 10 (citing Elliott M. Antman et al.,
    *Ischemic Heart Disease*, *Harrison's Principles of Internal Medicine* at 2000).).  Plaintiff
27  further explains that Class IV means "[p]atients have cardiac disease resulting in inability
    to carry on any physical activity without discomfort. Symptoms of cardiac insufficiency
28  or of the angina syndrome may be present even at rest. If any physical activity is
    undertaken, discomfort is increased."   (Doc. 22 at 10.)   The Commissioner does not
    dispute these definitions.

1    From 2009 through 2011, Kevin Cleary, D.O., was Plaintiff's primary care
2    physician. His diagnoses included coronary artery disease, non-insulin dependent
3    diabetes mellitus, peripheral neuropathy, and anxiety (for which he prescribed Ativan and
4    Trazadone)..   (Tr. 698-745.)   Dr. Cleary prescribed a wheelchair because Plaintiff
5    suffered falls.   (Tr. 569, 714)   Dr. Cleary also noted that Plaintiff used a walker.
6    (Tr. 700.)

7    **C.    Functional Capacity Assessments**

8    **1.    Jerry Dodson, M.D., Reviewing Physician**

9    In February 2010, as part of the initial disability determination, Jerry Dodson,
10   M.D., a state agency physician, completed a Physical Residual Functional Capacity
11   (RFC) Assessment. (Tr. 493-500.)   He reviewed the existing medical record regarding
12   Plaintiff's cardiac impairment and specifically discussed the August 2000 surgery and
13   subsequent sternum repair.   (Tr. 500.)   Dr. Dodson rated capacities for light work as
14   defined in the regulations.   (Tr. 494, 500.)   He opined that Plaintiff could not climb
15   ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, balance, stoop,
16   kneel, crouch, and crawl (Tr. 495), and could perform limited reaching and gross
17   manipulation. (Tr. 496.)   He opined that Plaintiff should avoid concentrated exposure to
18   extreme cold or hazards such as machinery or heights.   (Tr. 497.)   The ALJ's RFC
19   determination largely adopted this assessment.   (Tr. 19.)

20   **2.    Dr. Bear**

21   In May 2010, Dr. Bear completed a Cardiac Residual Functional Capacity
22   Questionnaire (Cardiac Questionnaire).   (Tr. 566-67.)   Dr. Bear noted Plaintiff's
23   diagnoses of hypertension, peripheral vascular disease, claudication, and osteomyelitis.
24   Dr. Bear found that Plaintiff suffered from chest pain, palpitations, and shortness of
25   breath due to these diagnosed impairments.   (Tr. 566.)   He opined that Plaintiff had
26   "significant limitation of physical activity as demonstrated by fatigue, palpitations,
27   dyspnea, or anginal discomfort."   (Tr. 567.)   He further opined that these symptoms
28   would often interfere with attention and concentration.   (*Id*.)   In an updated Cardiac

1   Questionnaire in October 2011, Dr. Bear listed diagnoses of coronary artery disease,
2   status post-coronary artery bypass grafting in 2009, cardiomyopathy, and diabetes.
3   (Tr. 817.)  Plaintiff's symptoms included chest pain, fatigue, weakness, and shortness of
4   breath.  Again, Dr. Bear noted that these symptoms would often interfere with Plaintiff's
5   attention and concentration and resulted in "significant limitation of physical activity."
6   (Tr. 817-18.)

7   **3.    Dr. Cleary**

8   Dr. Cleary completed a Medical Assessment of Ability to do Work Related
9   Physical Activity assessment in October 2011.  Dr. Cleary found that Plaintiff could sit
10   for less than six hours and stand/walk less than two hours in an eight-hour day.  (Tr. 748.)
11   Dr. Cleary noted that Plaintiff experienced increased "SOB [shortness of breath] with
12   exertion due to his CHF [congestive heart failure] and COPD [chronic obstructive
13   pulmonary disease]."   (Tr. 750.)   Dr. Cleary also completed a Fatigue Residual
14   Functional Capacity Assessment.  He opined that Plaintiff needed to nap for about one
15   hour during an eight-hour day.  (Tr. 746-47.)  He concluded that fatigue would often
16   interfere with Plaintiff's attention and concentration, resulting in an inability to sustain
17   work on a regular and continuing basis, eight hours a day, five days a week.  (Tr. 746.)

18   **III.   Administrative Hearing Testimony**

19   Plaintiff appeared and testified at the October 12, 2011 administrative hearing.
20   Plaintiff was in his late forties at the time.  He had a high school education and past
21   relevant work as a preparation cook.  (Tr. 72.)  Plaintiff testified that he was limited by
22   shortness of breath and chest pains.  (Tr. 63.)  He also testified that he suffered from
23   fatigue, and that he lay down "half an hour to an hour" five to six times a day.  He stated
24   that "[w]hen I get out of breath, I really want to lay down."  (Tr. 67.)

25   Vocational expert Linda Tolley also testified at the administrative hearing.
26   (Tr. 75.)  She testified in response to a hypothetical question from the ALJ that an
27   individual with the abilities assessed by the initial state agency reviewer, Dr. Dodson,
28   could perform jobs at the light exertional level, such as parking lot attendant, ticket seller,

1    and small parts assembler, (Tr. 72-73), which are the jobs the ALJ relied upon in her
2    determination that Plaintiff was not disabled.  (Tr. 29.)  The ALJ conceded that the
3    limitations assessed by the treating physicians Dr. Bear and Dr. Cleary would preclude
4    sustained work.  (Tr. 75.)  The vocational expert testified that a person with the
5    limitations to which Plaintiff testified, who needed to lie down throughout the day for a
6    combined total of approximately five hours, would be unable to sustain work on a
7    continuing and regular basis.  (Tr. 76-77.)

8    **IV.    The ALJ's Decision**

9         A claimant is considered disabled under the Social Security Act if he is unable "to
10   engage in any substantial gainful activity by reason of any medically determinable
11   physical or mental impairment which can be expected to result in death or which has
12   lasted or can be expected to last for a continuous period of not less than 12 months."  42
13   U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for
14   supplemental security income disability insurance benefits).  To determine whether a
15   claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20
16   C.F.R. §§ 404.1520, 416.920.

17        **A.    Five-Step Evaluation Process**

18        In the first two steps, a claimant seeking disability benefits must initially
19   demonstrate (1) that he is not presently engaged in a substantial gainful activity, and
20   (2) that his impairment is severe.  20 C.F.R. § 404.1520(a)(c).  If a claimant meets steps
21   one and two, he may be found disabled in two ways at steps three through five.  At step
22   three, he may prove that his impairment or combination of impairments meets or equals
23   an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20
24   C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively
25   disabled.  If not, the ALJ determines the claimant's RFC.  At step four, the ALJ
26   determines whether a claimant's RFC precludes him from performing his past work.  20
27   C.F.R. § 404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden
28   shifts to the government at step five to establish that the claimant can perform other jobs

that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.   ALJ's Application of Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period.  (Tr. 16.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "intermittent claudication in the left leg, coronary artery disease status post bypass grafting, obstructive sleep apnea, mild obstructive pulmonary disease, ventricular aneurysm resection, obesity, diabetes mellitus, status post umbilical hernia repair, and adjustment disorder." (Tr. 16.) At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)  The ALJ next determined that Plaintiff retained the RFC "to perform light work" as defined in 20 C.F.R. § 404.1567(b) and § 416.967 with postural, manipulative, and environmental limitations.[5]  (Tr. 19.)  The ALJ also concluded that Plaintiff's mental impairments limited him to simple work.  (*Id*.)  At step four, the ALJ concluded that Plaintiff could not perform his past relevant work.  (Tr. 28.)  At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, he could perform other "jobs that exist in significant numbers in the national economy." (*Id*)  The ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. 29.)

## V.   Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

---

[5]  Specifically, the ALJ found that "[Plaintiff] is limited to lifting and carrying no more than ten pounds.  He is also able to stand or walk for six hours in an eight-hour day, with normal breaks.  He is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  The claimant is unable to climb ladders, ropes, or scaffolds.  The claimant is limited to frequent reaching and gross manipulation.  He must avoid concentrated exposure to extreme cold and hazards, including moving machinery and heights." (Tr. 19.)

1   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

2   court reviews the Commissioner's final decision under the substantial evidence standard

3   and must affirm the Commissioner's decision if it is supported by substantial evidence

4   and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996);

5   *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if the

6   ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are

7   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

8           Substantial evidence means more than a mere scintilla, but less than a

9   preponderance; it is "such relevant evidence as a reasonable mind might accept as

10   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

11   (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

12   determining whether substantial evidence supports a decision, the court considers the

13   record as a whole and "may not affirm simply by isolating a specific quantum of

14   supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

15   quotation and citation omitted).

16           The ALJ is responsible for resolving conflicts in testimony, determining

17   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

18   Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

19   interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.*

20   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

21   **VI.   Plaintiff's Claims**

22           Plaintiff asserts that the ALJ erred in her assessment of the medical source opinion

23   evidence and by rejecting Plaintiff's symptom testimony without providing clear and

24   convincing reasons for doing so.  (Doc. 20.)  Plaintiff asks the Court to remand this

25   matter for a determination of disability benefits.  In response, the Commissioner argues

26   that the ALJ's decision is free from legal error and is supported by substantial evidence in

27   the record.  (Doc. 26.)  For the reasons discussed below, the Court reverses the

28   Commissioner's determination and remands for an award of benefits.

- 9 -

### A.     Weight Assigned to Medical Source Opinions

In weighing medical source evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating physician's opinion.  *Id.*  The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion.  *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ."  *Orn,* 495 F.3d at 631.

The record here includes opinions regarding Plaintiff's physical functional abilities from treating physicians Dr. Bear and Dr. Cleary.  Plaintiff asserts that the ALJ erred by rejecting those opinions in favor of the opinion of the state agency reviewing physician.  (Doc. 20 at 1.)  As discussed below, under either the "clear and convincing" or the "specific and legitimate" standard, the ALJ erred in the weight he assigned to these opinions.

### 1.     Weight Assigned Dr. Bear's Opinion

In the May 2010 Cardiac Questionnaire, Dr. Bear opined that Plaintiff had palpitations and shortness of breath related to his diagnoses of chest pain, hypertension, peripheral vascular disease, claudication, and osteomyolitis.  (Tr. 566.)  He also noted that Plaintiff experienced anginal pain for one-half hour to one hour.  (*Id.*)  He checked "yes" in response to whether the patient had "significant limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or angina discomfort on ordinary physical activity."     (Tr. 567.)     He further noted that Plaintiff "often" experienced "symptoms . . . severe enough to interfere with attention and concentration."[6]  (Doc. 567.)  The ALJ rejected this opinion as "vague and conclusory" stating that Dr. Bear provided little explanation of the evidence relied upon in reaching this conclusion. (Tr. 26.)

An ALJ may properly reject a treating physician's opinion that is conclusory and unsupported by medical findings.  *See Batson,* 359 F.3d at 1195 (holding that the ALJ did not err in giving minimal evidentiary weight to the opinion of the claimant's treating physician when the opinion was in the form of a checklist, did not have supportive objective evidence, was contradicted by other statements and assessments of the claimant's medical condition, and was based on the claimant's subjective descriptions of pain); *see also Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected psychological evaluations because they were check-the-box reports that did not contain explanations of the bases of their conclusions).

Although the Cardiac Questionnaires that Dr. Bear completed contained several check-the-box type questions, they also required Dr. Bear to provide support for those conclusions by citing medical findings, and he noted specific medical findings in support of his opinion.  (Tr. 566, 817.)  The Cardiac Questionnaires instructed Dr. Bear to "base [his] assessment on [his] independent clinical judgment" (Tr. 566, 817), and it appears that he relied on his treatment history of Plaintiff to complete the Cardiac Questionnaires.

---

[6]     Dr. Bear chose "often" from a range of "never," "seldom," "often," "frequently," and "constantly."  (Tr. 567.)

*See Mansour v. Astrue*, 2009 WL 272865, at *6 n.14 (C.D. Cal. Feb. 2, 2009) (rejecting contention that treating physician's opinion on a "check-the-box" form lacked supporting evidence to substantiate the responses on the form because the physician's treatment notes in the record supported his finding on the opinion form).   Accordingly, the Commissioner's assertion that Dr. Bear did not sufficiently explain the basis for his opinions is not a legally sufficient reason for rejecting his opinions.  *See Orn*, 495 F.3d at 629 (permitting reliance on "Multiple Impairment Questionnaire[s]" completed by treating physician); *see also Howell v. Comm'r So. Sec. Admin.*, 349 Fed. Appx. 181, 184 (9th Cir. 2009) (stating that "[a]n ALJ ought not dismiss a treating physician's testimony merely because it was contained on [a check off] form" but finding any error in doing so harmless because ALJ had "enough evidence" to reject the physician's testimony).

The ALJ also stated that he rejected Dr. Bear's assessments because they contained "little indication of the specific limitations that the claimant's impairments impose."  (Tr. 26.)  The record reflects that the ALJ responded to all of the inquiries on the Cardiac Questionnaires and indicted that Plaintiff had "significant limitation of physical activity," and that his symptoms often interfered with his attention and concentration.  (Tr. 567, 818.)  During the administrative hearing, the ALJ recognized that Dr. Bear's assessment that Plaintiff's "symptoms often interfere with attention and concentration . . . ."  (Tr. 75.)  The ALJ conceded that such limitations would preclude sustained work.  (*Id*.)  Dr. Bear sufficiently identified Plaintiff's limitations; therefore the ALJ's description of the Dr. Bear's opinions contained on the 2010 and 2011 Cardiac Questionnaires is unsupported by the record and is not a legally sufficient basis for rejecting his opinions.

### 2.    Weight Assigned Dr. Cleary's Opinion

On an October 4, 2011 Fatigue RFC Questionnaire, Dr. Cleary opined that Plaintiff's fatigue imposed moderate limitations on his ability to function.  (Tr. 746.)  He found that Plaintiff's fatigue "often" interfered with his attention and concentration.  (*Id*.)  He also noted that Plaintiff needed to take naps during the day.  (*Id*.)  Dr. Clearly also

completed a Medical Assessment of Ability to do Work Related Physical Activities and opined that Plaintiff could stand/walk for less than two hours in an eight-hour work day, and that he could sit less than six hours in an eight-hour work day.[7]  (Tr. 748.)

The ALJ rejected Dr. Cleary's opinion as inconsistent with the treating record showing that Plaintiff's cardiac impairments were "stable."  (Tr. 27.)  In support of this conclusion, the ALJ cited several treatment records.  (Tr. 27 (citing Admin. Hrg. Exs. 4F, pp. 4-7, 13-16, 5F pp. 1-4, 10F pp. 1-2, 15F pp. 5-6, 28F pp. 5-11).)  Administrative hearing exhibit 4F at 4-6 (Tr. 297-299) mainly concerns Plaintiff's umbilical hernia and anxiety and includes an October 5, 2009 notation that Plaintiff "uses a walker" because he "gets vertigo and falls."  (Tr. 297-299.)  These treatment records do not support the ALJ's conclusion that Dr. Cleary's opinion was inconsistent with the treatment records.

The ALJ also cites administrative hearing exhibit 4F at 7, 13-16 (Tr. 300, 306-309), which includes treatment notes from Roger Hucek, M.D.  These notes describe the September 16, 2009 sternal debridement procedure that Dr. Hucek performed to treat an infection around Plaintiff's lower sternum.  (Tr. 306.)  These records indicate that Plaintiff was "in satisfactory condition" when he was taken to the recovery room post-surgery. (Admin. Hrg. Ex. 4F at 13-16, Tr. 309.)  These treatment notes also indicate that Plaintiff's recovery was going "well" one month after surgery. (Tr. 300.)  Although these treatment notes reflect that Plaintiff did well after a surgical procedure, they do not indicate that Plaintiff was no longer limited by his cardiac impairment-related symptoms and do not demonstrate that Dr. Cleary's opinion was inconsistent with the treatment records.

In rejecting Dr. Cleary's opinion, the ALJ also relied on administrative hearing exhibit 5F at 1-4 (Tr. 310-313).  This exhibit includes treatment notes from Dr. Michael

---

[7]  Dr. Cleary also found that Plaintiff was limited to "frequent" grasping, fine manipulation, and feeling.  (Tr. 28.)  The ALJ rejected Dr. Cleary's opinion regarding Plaintiff's use of his upper extremities because Plaintiff had not reported any difficulties related to his upper extremities to his treating physicians. (Tr. 27.)  Although the ALJ stated that he rejected these findings, his RFC assessment included similar limitations except that the ALJ found that Plaintiff could frequently reach and Dr. Cleary assessed that Plaintiff was limited to occasional reaching. (*compare* Tr. 19 *with* Tr. 749.)

Desvigne, M.D., at Banner Boswell Medical Center regarding follow-up treatment in October 2009 for Plaintiff's "flap coverage of sternal wound with a history of coronary artery bypass with secondary infection." (Tr. 310.) These treatment notes indicated that Plaintiff was "doing well post-operatively" and that his incision was "well-healed." (Tr. 311-313.) These records do not support the ALJ's conclusion that Dr. Cleary's assessment of Plaintiff's fatigue and physical limitations was inconsistent with the treating record.

The ALJ next cites administrative hearing exhibit 10F at 1-2 (Tr. 514-15). This portion of the record details a stress test performed on referral from Dr. Bear on April 19, 2010. This notation indicates that Plaintiff had "no obvious reversible ischemia and that his "left ventricular ejection fraction by stress gated SPECT is 36%." (Tr. 514.) This stress test from 2010 does not conflict with Dr. Cleary's assessment of Plaintiff's functional abilities over one year after that stress test. The ALJ also relies on a July 13, 2010 treatment note by Physician Assistant (PA) C. Robert Vanselow at Cardiovascular Consultants stating that Plaintiff "was stable from a cardiovascular standpoint" (Admin. Hrg. Ex. 15F at 5-6, Tr. 553-54), and several similar treatment notes from Dr. Bear and Dr. Rahool Karnik, M.D.[8] (Admin. Hrg. Exs. 28F at 5-11, Tr. 650-656.)

Although these treatment notes use the term "stable," they do no define that term. Plaintiff argues that "stable" is a relative term that does not shed light on the extent to which Plaintiff's impairments limited his functional abilities. (Doc. 20 at 21.) When the treatment notes are read in their entirety, "it appears clear that 'stable' in this context does not mean "improved" or 'controlled,' but rather 'has not worsened,' or 'has not increased.'" *Vasquez v. Astrue*, 2013 WL 491977, at *9 (D. Ariz. Feb. 8, 2013). Although PA Vanselow noted that Plaintiff was "stable," he also assessed "chest pain" and noted that Plaintiff had "weakness in both lower extremities." (Tr. 554.) Similarly, although Dr. Bear and Dr. Karnik considered Plaintiff "stable" from a cardiovascular

---

[8] The record reflects that Dr. Bear, Dr. Karnik, and NP Vanselow treated Plaintiff at Cardiovascular Consultants. (Tr. 646-97.)

1  standpoint, they described "chest pain" and "shortness of breath" as "active problems."

2  (Tr. 651-653, 654-656.)   In short, substantial evidence does not support the ALJ's

3  determination that Dr. Cleary's assessment was inconsistent with the medical record and,

4  thus, the ALJ's rejection of his opinion is legal error.

5         **B.**      **The Two-Step Credibility Analysis**

6         Plaintiff also asserts that the ALJ erred in rejecting his subjective complaints.   An

7  ALJ engages in a two-step analysis to determine whether a claimant's testimony

8  regarding subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028,

9  1035-36 (9th Cir. 2007).   "First, the ALJ must determine whether the claimant has

10  presented objective medical evidence of an underlying impairment 'which could

11  reasonably be expected to produce the pain or other symptoms alleged.'"   *Id*. at 1036

12  (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

13         The claimant is not required to show objective medical evidence of the pain itself

14  or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at

15  1282.  Instead, the claimant must only show that an objectively verifiable impairment

16  "could reasonably be expected" to produce his pain.  *Lingenfelter*, 504 F.3d at 1036

17  (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec*., 533 F.3d

18  at 1160-61 (9th Cir. 2008) ("requiring that the medical impairment could reasonably be

19  expected to produce pain or another symptom . . . requires only that the causal

20  relationship be a reasonable inference, not a medically proven phenomenon").

21         Second, if a claimant produces medical evidence of an underlying impairment that

22  is reasonably expected to produce some degree of the symptoms alleged, and there is no

23  affirmative evidence of malingering, an ALJ must provide "clear and convincing

24  reasons" for an adverse credibility determination.  *See Smolen*, 80 F.3d at 1281; *Gregor*

25  *v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

26         In evaluating a claimant's credibility, the ALJ may consider the objective medical

27  evidence, the claimant's daily activities, the location, duration, frequency, and intensity

28  of the claimant's pain or other symptoms, precipitating and aggravating factors,

1   medication taken, and treatments for relief of pain or other symptoms.  *See* 20 C.F.R.

2   § 404.1529(c); *Bunnell*, 947 F.2d at 346.  An ALJ may also consider such factors as a

3   claimant's inconsistent statements concerning his symptoms and other statements that

4   appear less than candid, the claimant's reputation for lying, unexplained or inadequately

5   explained failure to seek treatment or follow a prescribed course of treatment, medical

6   evidence tending to discount the severity of the claimant's subjective claims, and vague

7   testimony as to the alleged disability and symptoms.  *See Tommasetti v. Astrue*, 533 F.3d

8   1035, 1040 (9th Cir. 2008); *Smolen*, 80 F.3d 1273, 1284 (9th Cir. 1996).  If substantial

9   evidence supports the ALJ's credibility determination, that determination must be upheld,

10   even if some of the reasons cited by the ALJ are not correct.  *Carmickle*, 533 F.3d at

11   1162.

12          C.      **Plaintiff's Pain and Symptom Testimony**

13          Because there was no record evidence of malingering, the ALJ was required to

14   provide clear and convincing reasons for concluding that Plaintiff's subjective complaints

15   were not wholly credible.  Plaintiff argues that the ALJ failed to do so.  (Doc. 20 at 24-

16   32.)  The Commissioner has not responded to this claim.  (Doc. 26.)  The ALJ listed

17   several factors in support of her credibility assessment including that: (1) Plaintiff's

18   "daily activities [were] not limited to the extent one would expect, given the complaints

19   of disabling symptoms and limitations;" (2) treatment had been "generally successful" in

20   controlling his symptoms; and (3) the objective medical record did not substantiate the

21   limitations Plaintiff alleged and Plaintiff's hearing testimony regarding the frequency of

22   his falls was inconsistent with the medical record.  (Tr. 24-25.)

23          As an initial matter, the ALJ stated that "the objective findings in the record do not

24   confirm the limitations alleged by" Plaintiff.  (Tr. 24.)  The absence of fully corroborative

25   medical evidence cannot form the *sole* basis for rejecting the credibility of a claimant's

26   subjective complaints.  *See Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir.1986) (it is

27   legal error for "an ALJ to discredit excess pain testimony solely on the ground that it is

28   not fully corroborated by objective medical findings"), *superseded by statute on other*

1    *grounds as stated in Bunnell v. Sullivan*, 912 F.2d 1149 (9th Cir. 1990); *see also Burch*,

2    400 F.3d at 681 (explaining that the "lack of medical evidence" can be "a factor" in

3    rejecting credibility, but cannot "form the sole basis"); *Rollins v. Massanari*, 261 F.3d

4    853, 856–57 (9th Cir. 2001) (same).  Thus, absent some other stated legally sufficient

5    reason for discrediting Plaintiff, the ALJ's credibility determination cannot stand.

6           As discussed below, although the ALJ's other reasons for discrediting Plaintiff's

7    subjective complaints could constitute clear and convincing reasons in support of a

8    credibility determination, they are not supported by substantial evidence in the record,

9    and therefore, do not support the ALJ's credibility determination in this case.

10                            **1.    Plaintiff's Activities**

11          In discounting Plaintiff's credibility, the ALJ noted that, although Plaintiff uses a

12   walker and a wheelchair, he "testified at the hearing that he is able to perform some

13   household tasks, including housecleaning and vacuuming," and "tried to go grocery

14   shopping with his wife."  (Tr. 24.)  The ALJ also noted that Plaintiff "went to cardiac

15   rehab prior to his hernia surgery."  (*Id.*)

16          Although an ALJ may rely on activities that "contradict claims of a totally

17   debilitating impairment" to find a claimant less than credible, *Molina v. Astrue*, 674 F.3d

18   1104, 1113 (9th Cir. 2012), the ALJ's finding here is not supported by substantial

19   evidence.  While the record contains evidence that Plaintiff went to cardiac rehabilitation

20   (Tr. 656, 694, 743), the record indicates that Plaintiff's treating physicians advised him to

21   pursue such treatment.  (Tr. 656.)  Plaintiff's participation in rehabilitation at the advice

22   of his treating physicians is not inconsistent with his claims of limitations.  *See Vertigan*

23   *v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (claimant's ability to swim, do physical

24   therapy, and exercise at home did not detract from claimant's credibility); *Clark v.*

25   *Colvin*, 2013 WL 6189726, at *5 (W.D. Wash. Nov. 26, 2013) (concluding that

26   claimant's swimming and stretching were not inconsistent with her reports of pain

27   because her doctors encouraged her to exercise).

28

1    The ALJ also considered Plaintiff's activities — housecleaning, vacuuming, and
2  limited grocery shopping with his wife — and concluded those activities were
3  inconsistent with his complaints of disabling limitations.  (Doc. 24.)  However, the Ninth
4  Circuit has stated that the fact a claimant engages in normal daily activities "does not in
5  any way detract from [his] credibility as to [his] overall disability."  *Vertigan*, 260 F.3d at
6  1050.  The Ninth Circuit explained that, "[o]ne does not need to be 'utterly incapacitated'
7  in order to be disabled."  *Id*. (quoting *Fair*, 885 F.2d at 603).  Rather, the daily activities
8  must involve skills that could be transferrable to a workplace and a claimant must spend a
9  "substantial part of his day" engaged in those activities.  *See Orn*, 495 F.3d at 639
10  (finding that the ALJ erred in failing to "meet the threshold for transferable work skills,
11  the second ground for using daily activities in credibility determinations").

12    Here, the ALJ did not find that Plaintiff's limited activities could be transferred to
13  a work setting, or indicate whether Plaintiff spent a "substantial" part of his day engaged
14  in such activities.  The Ninth Circuit has opined that, "[d]aily household chores and
15  grocery shopping are not activities that are easily transferable to a work environment."
16  *Blau v. Astrue*, 263 Fed. Appx 635, 637 (9th Cir. 2008).  Thus, Plaintiff's limited
17  activities of daily living were not clear and convincing evidence to discount his
18  credibility.  *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did
19  not constitute convincing evidence that the claimant could function regularly in a work
20  setting).

21                   **2.       Symptoms Controlled by Treatment**

22    In assessing a claimant's credibility about his symptoms, the ALJ may consider
23  "the type, dosage, effectiveness, and side effects of any medication."   20 C.F.R.
24  § 404.1529(c).   Additionally, the treatment the claimant received, especially when
25  conservative, is a legitimate consideration in a credibility finding.  *See Meanel v. Apfel*,
26  172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure
27  to prescribe, and the claimant's failure to request, medical treatment commensurate with
28  the "supposedly excruciating pain" alleged); *see also Burch*, 400 F.3d at 681 (finding the

ALJ's consideration of the claimant's failure to see treatment for a three or four month period was "powerful evidence" and an "ALJ is permitted to consider lack of treatment in his credibility determination).

Here, the ALJ found that, although Plaintiff had received various forms of treatment, including bypass surgery and procedures related to an infection in 2009, treatment had been "generally successful" in controlling his symptoms and treatment notes indicated that Plaintiff was "stable" from a cardiovascular standpoint in 2010 and 2011. (Tr. 24.)  Plaintiff argues that "stable" is "a relative term that does not inform as to the effect of [Plaintiff's] medical impairments on his ability to function."  (Doc. 20 at 29.) Evidence that treatment can effectively control an impairment may be a clear and convincing reason to find a claimant less credible.  *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *Warre v. Comm'r, of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (stating that "[i]mpairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits.").

Here, as the ALJ noted, the record reflects that Plaintiff recovered from bypass surgery and related procedures in 2009.  (Tr. 24, 300, 310-313.)  However, he continued receiving treatment for cardiac impairments.  In support of his conclusion that Plaintiff's symptoms were controlled, the ALJ cites a July 13, 2010 treatment note (Admin. Hrg. Ex. 15F at 5-6, Tr. 553-54), in which Plaintiff denied "dizziness, chest pain or discomfort, palpitations, shortness of breath, edema, and PND" and in which his cardiac status was described as "stable."  (Tr. 554.)  However, that same treatment note assessed "chest pain" and lower extremity weakness.  (*Id.*)

The ALJ also relied on Dr. Karnik's January 27, 2011 treatment note in which Plaintiff denied "chest pain or discomfort palpitations, dizziness, shortness of breath, edema, PND, orthopnea and syncope."  (Admin. Hrg. Ex. 28F at 11, Tr. 654.)  Dr. Karnik noted that Plaintiff was "stable" from a cardiovascular standpoint and that he could safely resume cardiac rehab.  (Tr. 655-56.)  However, on that same treatment note, Dr. Karnik included "chest pain" and "shortness of breath" as active problems and noted that

1   Plaintiff had recently been hospitalized for "chest discomfort symptoms."  (Tr. 654.)

2   Finally, the ALJ cites Dr. Bear's July 21, 2011 treatment note that described Plaintiff as

3   "stable from a cardiovascular standpoint."  (Tr. 650.)   Again, the ALJ overlooked

4   Dr. Bears's assessment of "chest pain."  (*Id*.)

5          Additionally, the ALJ overlooked other treatment notes indicating that, even if

6   Plaintiff's cardiovascular condition was considered "stable," he continued to experience

7   symptoms related to his cardiac impairments including Dr. Bear's June 16, 2011

8   treatment note describing "chest pain" and "shortness of breath" as "active problems" and

9   noting that Plaintiff was "stable from a cardiovascular standpoint."  (Tr. 651-653.)   In

10  addition, on August 11, 2011, Dr. Cleary referred Plaintiff to a specialist, Pulmonary

11  Associates, for "dysnea/SOB [shortness of breath]."  (Tr. 703.)

12         Although responsiveness to treatment can constitute a clear and convincing reason

13  for discounting a claimant's subjective complaints, the ALJ's determination in this case is

14  not supported by substantial evidence in the record.   The record reflects that Plaintiff

15  received ongoing treatment for his cardiac impairments and continued to experience

16  related symptoms.

17         **3.     Inconsistencies between the Record and Testimony**

18         The ALJ also discounted Plaintiff's credibility because of alleged inconsistencies

19  between his testimony and the medical record.  (Tr. 25.)  The ALJ noted that although

20  Plaintiff had reported frequent falls to treating sources, at the hearing he testified that he

21  had only fallen "a couple of times" at cardiac rehab.  (*Id*.)  At that administrative hearing,

22  the ALJ asked Plaintiff, "You ever fall?"  Plaintiff responded, "Yeah, I've fallen a couple

23  of times, in the bathtub I fell a couple times over at rehab."  (Tr. 71.)  Considering the

24  manner in which the ALJ phrased the question, Plaintiff may have reported the frequency

25  of his falls at the time of the administrative hearing.  Plaintiff's testimony regarding his

26  then-current history of falling was not inconsistent with his past history of falling

27  contained in the medical record, but merely reflected a change in the frequency of that

28  particular symptom.

1    **VII.    Summary and Remedy**

2          Considering the record as a whole, the Court concludes that the ALJ erred in

3    rejecting the treating physicians' opinions and in rejecting Plaintiff's subjective

4    complaints.    Accordingly, the Court reverses the Commissioner's disability

5    determination.

6          Because the Court has decided to vacate the Commissioner's decision, it has the

7    discretion to remand the case for further development of the record or for an award

8    benefits.  *See Reddick*, 157 F.3d at 728.  In *Smolen*, the Ninth Circuit held that evidence

9    should be credited as true and an action remanded for an immediate award of benefits

10   when the following three factors are present: (1) the ALJ failed to provide legally

11   sufficient reasons for rejecting evidence; (2) there are no outstanding issues that must be

12   resolved before a determination of disability can be made; and (3) it is clear from the

13   record that the ALJ would be required to find the claimant disabled were such evidence

14   credited.[9]  *Smolen*, 80 F.3d at 1292; *see Varney v. Sec. of Health & Human Servs.*, 859

15   F.2d 1396, 1400 (9th Cir. 1988) ( *Varney II* ) (stating that "[i]n cases where there are no

16   outstanding issues that must be resolved before a proper determination can be made, and

17   where it is clear from the record that the ALJ would be required to award benefits if the

18   claimant's excess pain testimony were credited, we will not remand solely to allow the

19   ALJ to make specific findings regarding that testimony."); *Rodriguez v. Bowen*, 876 F.2d

20   759, 763 (9th Cir. 1989) ("In a recent case where the ALJ failed to provide clear and

21   convincing reasons for discounting the opinion of claimant's treating physician, we

22          [9]  The Commissioner argues that the credit-as-true rule is inconsistent with the Act
23   and with the dissenting opinion in *Vasquez v. Astrue*, 572 F.3d 572, 586 (9th Cir. 2009)
     (O'Scannlain, J., dissenting) (stating that the Commissioner's argument that the "credit-
24   as-true" rule is invalid as contrary to the statute and Supreme Court precedent appeared
     "strong.").   (Doc. 26 at 12 n.11.)   However, the dissent in *Vasquez* also noted that
25   "because the crediting-as-true rule is part of [the Ninth] circuit's law, only an en banc
26   court can change it."   *Vasquez*, 572 F.3d at 602 (O'Scannlain, J. dissenting).   This Court
     cannot ignore the credit-as-true rule based on the Commissioner's claims that it conflicts
27   with the Social Security Act and usurps the ALJ's role as finder of fact.

28

1    accepted the physician's uncontradicted testimony as true and awarded benefits.") (citing

2    *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)).  The Ninth Circuit has frequently

3    reaffirmed that improperly rejected evidence should be credited as true.  *See Harman v.*

4    *Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000); *Lester*, 81 F.3d at 834; *Reddick*, 157 F.3d at

5    729; *McCartey v. Massanari*, 298 F.3d 1072, 1076–77 (9th Cir. 2002).

6         The Court has found that the ALJ failed to provide legally sufficient reasons

7    supported by substantial record evidence for rejecting the treating physicians' opinions

8    and for rejecting Plaintiff's subjective complaints.  There are no outstanding issues to be

9    resolved before a disability determination may be made because the record shows that the

10   ALJ would find Plaintiff incapable of any sustained work, and thus disabled, if Dr. Bear's

11   or Dr. Cleary's opinions were credited as true.[10]   (*See* Tr. 75.)   Additionally, the

12   vocational expert testified that an individual with the need to lie down for "a combined

13   total of approximately five hours per day," limitations to which Plaintiff testified, would

14   be unable to sustain work on a regular and continuing basis.  (Tr. 76-77.)  Thus, "a

15   remand for further proceedings would serve no useful purpose."  *Reddick*, 157 F.3d at

16   730.  On the record before the Court, the treating physicians' assessment and Plaintiff's

17   subjective complaints of disabling pain should be credited as true and the case remanded

18   for an award of benefits.[11]  *See Smolen*, 80 F.3d at 1284.

19

20         [10]   The ALJ concluded that "Dr. Cleary indicates his opinion that a full time work
     schedule cannot be sustained, so I have no questions on that."  (Tr. 75.)  He also stated
21   that "Dr. Bear stated that symptoms often interfere with attention and concentration and I
     believe if attention and concentration is often interfered with throughout a workday,
22   there's no work that can be sustained."  (Tr. 75.)

23         [11]   The Commissioner argues that the case should be remanded for further
     proceedings because the ALJ did not obtain testimony from the vocational expert
24   regarding whether an individual with the limitations assessed by Dr. Bear or Dr. Cleary
     could sustain work on a regular and continuing basis.  (Doc. 26 at 14.)  Although the ALJ
25   did not obtain expert testimony on that issue, she conceded that she would find Plaintiff
     disabled based on Dr. Bear's or Dr. Cleary's opinions.  Because it is clear that the ALJ
26   would find Plaintiff disabled based on Dr. Bear's or Dr. Cleary's opinion, remanding for
     further proceedings is unnecessary.

27         Moreover, the Court's determination that Plaintiff's subjective complaints should
     be credited as true by itself supports remand of this matter for an award of benefits.  The
28   Court notes that an ALJ cannot find disability based solely on the claimant's testimony.
     Rather, there must also be medically acceptable clinical or laboratory evidence which

Accordingly,

**IT IS ORDERED** that the Commissioner's decision denying benefits is **reversed** and that this matter is **remanded** for an award of benefits.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 12th day of March, 2014.

_____

Bridget S. Bade
United States Magistrate Judge

---

"could reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A). Here, it is not disputed that Plaintiff has a medical impairment which could reasonably be expected to cause the alleged symptoms. (Tr. 24 ("After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms").) Rather, the issue is the "intensity and persistence" of those symptoms which may be established by "statements of the individual or his physician." 42 U.S.C. § 423(d)(5)(A).